Affirmed and Substitute Memorandum
Opinion filed June 3, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00289-CR

___________________

 

EUDALIA BONILLA, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee



 



 

 

On Appeal from the 239th District Court

Brazoria County, Texas

Trial Court Cause No. 51,110



 



 

 

SUBSTITUTE MEMORANDUM OPINION

A jury convicted appellant, Eudalia Bonilla, of felony theft amounting to
at least $1,500.00 but less than $20,000.00 (aggregated).  In seven issues, appellant
contends the evidence is legally insufficient to support the jury’s verdict, her
due process rights were violated, and the trial court erred in denying her
request for a jury instruction on mistake of law and overruling her objection
to the prosecutor’s closing argument.  We affirm.

I.  
Background

            Appellant
is the mother of four children, including C.B., a female who was
fourteen-years-old at the time of trial.  Linda Nesmith is C.B.’s paternal
grandmother and has had legal custody of C.B. since 1997.  

            In
July 2004, Nesmith was interviewed by Texas Health and Human Services
Commission (“HHSC”) eligibility specialist Debbie Brock regarding Nesmith’s
eligibility for benefits, including food-assistance benefits for C.B.  Brock
discovered C.B. was already the subject of a benefits claim by appellant.  Nesmith
told Brock that C.B. had lived with her for several years and presented court
documents establishing her legal custody of C.B.  Brock notified appellant that
she would no longer be allowed to claim C.B. as part of her household for
benefits purposes.  Appellant did not respond to the notice.

            Appellant’s
alleged food-stamp fraud was referred to Kameshia McCoy, a senior fraud investigator
with HHSC.  McCoy concluded from her investigation that appellant’s fraudulent
activities began in April 2002.  She also concluded appellant was overissued $4,093.43
from HHSC as a result of wrongfully claiming benefits for C.B.

            Appellant
was indicted for felony theft-aggregated.  Following a jury trial and
conviction, appellant entered into a plea agreement relative to punishment.

II.  
Analysis

A.        Legal
Sufficiency of the Evidence

We begin by addressing appellant’s issues challenging legal sufficiency
of the evidence supporting the jury’s verdict.  In her first issue, appellant
contends the evidence is legally insufficient to support the jury’s finding that
she deceived HHSC by claiming C.B. as part of her household because an
incorrect legal standard was used by the State and trial court for determining that
C.B. did not “live with” appellant.  In her third issue, appellant contends the
evidence is legally insufficient to support the jury’s finding that she was
deceptive during the entire period of time the State examined to determine the
aggregate amount of alleged theft.  In her fourth issue, appellant contends the
evidence is legally insufficient to support the jury’s finding that she had the
requisite criminal intent to commit theft.

In determining legal sufficiency, we view all of the evidence in the light most favorable to
the verdict and decide whether a trier of fact could have found each element of
the offense beyond a reasonable doubt.  Young v. State, 14 S.W.3d 748, 753 (Tex. Crim. App. 2000).  The jury is the exclusive judge of
the credibility of witnesses and the weight to be given their testimony; it is
the exclusive province of the jury to reconcile conflicts in the evidence.  Wesbrook v. State, 29 S.W.3d 103,
111 (Tex. Crim. App. 2000).  Thus, when performing a legal-sufficiency
review, we may not re-evaluate the weight and credibility
of the evidence and substitute our judgment for that of the factfinder.  Dewberry
v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).  A factfinder may
disbelieve some or all of a witness’s testimony, even when that testimony is
uncontradicted.  Hernandez v. State, 161 S.W.3d 491, 501 (Tex. Crim.
App. 2005).  We must resolve any inconsistencies in the testimony in favor of
the verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

1.         Food-Stamp Eligibility Standards

We first consider whether the evidence is legally sufficient to support
the contention that the correct legal standard was used for determining whether
appellant and C.B. lived together.  Interpretation of federal food-stamp law
and regulations is a question of law we consider de novo.  See
Anderson v. State, 193 S.W.3d 34, 38 (Tex. App.—Houston [1st Dist.] 2006,
pet. ref’d) (“Statutory interpretation is a question of law.”); see also In
re R.C.T., No. 14-07-00642-CV, 2009 WL 2517054, at *2 (Tex. App.—Houston
[14th Dist.] June 18, 2009, pet. filed) (mem. op.) (interpreting state and
federal statutory language de novo).

The parties agree that a “household” eligible to receive food stamps is
defined in the federal regulations, in pertinent part, as, 

[A] group of
individuals who live together and customarily purchase food and prepare
meals together for home consumption.

[P]arents and their children
21 years of age or younger who live together, and children . . . under
18 years of age who live with and are under the parental control of a person
other than their parent together with the person exercising parental control
shall be treated as a group of individuals who customarily purchase and prepare
meals together for home consumption even if they do not do so. 

7 U.S.C.A. § 2012(i)
(West 1999) (emphasis added), amended by Farm Security and Rural Investment Act of 2002, Pub.
L. No. 107-171, § 4112(b)(1), 116 Stat. 134, 312–13 (2002) (current version at 7 U.S.C.A. § 2012(n) (West Supp. 2009))[1];
see also 7 C.F.R. § 273.1(a), (b)(1)(ii) (2009) (containing language
defining “household” in accord with language contained in 7 U.S.C.A. § 2012).[2]
 

The meaning of the phrase “live together,” which the parties concede is not
defined, is at the heart of appellant’s first issue.  Appellant explains that
the State, in attempting to establish she was ineligible to receive food stamps
for C.B., presented evidence that (1) she did not have legal custody of C.B., and
(2) a person can claim a child if the child lived with her more than fifty
percent of the time.  Appellant argues this evidence is “legally insufficient to
show that [C.B.] did not live with [appellant] as required by the food stamp
law . . . .”

Appellant misunderstands the State’s burden in this case.  Unlawful
appropriation of food stamps is chargeable under the general theft statute.  See
Gomez v. State, 663 S.W.2d 662, 663–64 (Tex. App.—Corpus Christi 1983, no
pet.).  Hence, the State had the burden of proving the elements of theft beyond
a reasonable doubt.  The standards employed by HHSC for determining whether
C.B. was part of appellant’s household were relevant only for purposes of
determining whether appellant committed theft—did appellant understand these
standards and know that she failed to meet them when she requested and received
benefits from HHSC?  Nevertheless, after reviewing the whole record, we hold
that the evidence is legally sufficient to support HHSC’s determination that
appellant and C.B. did not “live together” in compliance with the applicable
federal rules and regulations.

“The Food and Nutrition Service of the Department of Agriculture conducts
the food stamp program . . . , and the Secretary of Agriculture
issues regulations necessary for its administration.”  Shaffer
v. Block, 705 F.2d
805, 809 (2d Cir. 1983).[3]  For purposes
of determining what constitutes a “household,” the Department has decided not
to define “living with,” commenting that a “regulatory definition would be no
more effective then the application of a reasonable judgment based on the
circumstances of a particular living arrangement.”  47 Fed. Reg. 52,328, 52,329
(1982).  “Although the food stamp program is administered at the national level
by the [Department], it is administered by state agencies at the local level.  The
state agencies are responsible for determining, in accordance with uniform
national standards, which applicant households are eligible for the issuance of
food stamps . . . .”  Shaffer, 705 F.2d at 809 (citations omitted).  “No plan of operation submitted by a
State agency shall be approved unless the standards of eligibility meet those
established by the Secretary, and no State agency shall impose any other
standards of eligibility as a condition for participating in the program.” 
7 U.S.C.A. § 2014(b) (West 1999)
(current version at 7 U.S.C.A. § 2014(b) (West Supp. 2009)).  Additionally, no
one may be a member of more than one household in a given month.  7 C.F.R. §
273.3(a) (2009).[4]  We rely on
the foregoing in reviewing HHSC’s methodology for determining appellant and
C.B. did not “live together.”

McCoy conducted the investigation of appellant’s alleged welfare fraud. 
During her investigation, McCoy relied on court documents establishing that
Nesmith had custody of C.B., documentation from HHSC personnel’s
benefits-interviews with appellant, school records for C.B., and interviews
with Nesmith and other individuals.  McCoy also interviewed appellant, who told
her C.B. was only with Nesmith to go to school, and that she “picked [C.B.] up”
on Fridays and had possession of her on weekends.  McCoy agreed that appellant
was entitled to benefits for C.B. when she was living with appellant more than
fifty percent of the time.  As explained below, McCoy ultimately
determined appellant was overissued over four-thousand dollars by claiming
benefits for C.B. when they did not live together.

Additionally, even from appellant’s perspective, HHSC considered her
situation before advising her on eligibility.  Appellant testified that she
spoke with HHSC representatives several times and always explained her
situation to the representatives.  She testified that HHSC informed her she
could claim a child as part of her household as long as the child resided with
her at least fifteen days per month.  Appellant also testified that she
frequently called HHSC to remove C.B. from her file because the number of days
C.B. lived with her fluctuated month-to-month.  According to appellant, because
she called HHSC so often, she was eventually told her she could claim a child
when they lived together fourteen days per month.  Appellant claims HHSC
finally told her to stop claiming C.B. because the constant claiming and removing
was creating a large amount of paperwork.  Hence, the evidence supports that
HHSC personnel considered appellant’s situation and then advised her on the
number of days she needed to have possession of C.B. in order to claim her.

In sum, McCoy determined appellant and C.B. did not “live together,” and
other HHSC personnel instructed appellant regarding eligibility, after application
of a reasonable judgment based on the circumstances of appellant’s and C.B.’s
particular living arrangement.  See 47 Fed. Reg. at 52,329.[5]
 Accordingly, the evidence is legally sufficient to support that HHSC’s
standards for determining appellant’s eligibility comported with the federal
rules and regulations.  

2.         Legal-Sufficiency of Elements of Theft

We next consider whether the evidence is legally sufficient to support the
jury’s findings that appellant (1) deceived HHSC by claiming C.B. during a
period when appellant and C.B. did not live together, (2) was deceptive during
the entire period used to determine the aggregate value of the theft, and (3)
had the requisite criminal intent to commit theft.    

A person commits the offense of theft if she “unlawfully appropriates
property with intent to deprive the owner of property.”  Tex. Pen. Code Ann. §
31.03(a) (Vernon 2003).  A person acts with intent when it is her conscious
objective or desire to engage in the conduct or cause the result.  Id. §
6.03(a) (Vernon 2003).  Appropriation is unlawful if it is accomplished without
the owner’s effective consent.  Id. § 31.03(b)(1).  Consent is not
effective if it is induced by deception.  Id. § 31.01(3)(A) (Vernon
2003).  “Deception” means:

[C]reating
or confirming by words or conduct a false impression of law or fact that is
likely to affect the judgment of another in the transaction, and that the actor
does not believe to be true[.]

Id. § 31.01(1)(A).  Deception and intent
may be inferred from the circumstances.  See Lewis v. State, 715 S.W.2d 655, 657 (Tex.
Crim. App. 1986); Christensen v. State, 240 S.W.3d 25,
34–35 (Tex. App.—Houston [1st Dist.] 2007, pet. ref’d) (“A jury may infer
intent from any facts that tend to prove its existence, such as the acts,
words, and conduct of the defendant.”).  Circumstantial evidence is as probative
as direct evidence in establishing the guilt of an actor, and circumstantial
evidence alone can be sufficient to establish guilt.  Hooper v. State,
214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  An inference is a conclusion reached
by considering other facts and deducing a logical consequence from them.  Id.
at 16.  Speculation is mere theorizing or guessing about the possible meaning
of facts and evidence presented.  Id.  A conclusion reached by
speculation may not be completely unreasonable, but it is not sufficiently based
on facts or evidence to support a finding beyond a reasonable doubt.  Id.    

Appellant posits several reasons the evidence is legally insufficient to
support the jury’s findings that she acted deceptively or with criminal
intent.  She asserts the State relied solely on three governmental-assistance
applications as proof of her deception: (1) application of January 15, 2004, in
which appellant claimed C.B.; (2) application of May 4, 2004, in which appellant
did not claim C.B.; and (3) application of June 15, 2004, in which appellant
claimed C.B., but noted “Gone for summer.”[6] 
Appellant argues the January 15 application is the only possible evidence she
deceptively sought benefits for C.B., and any deception ended when she did not
claim C.B. in her May 4 application.  According to appellant, because the only
evidence possibly inferring that she received benefits by deception was for a
four-month period for which an amount of overissuance was not specified, it was
impossible for the jury to determine how much she wrongfully misappropriated. 
Appellant also argues the applications actually support her contention that she
complied with HHSC’s eligibility standards because they reflect she consciously
attempted to determine when she could and could not claim C.B., even noting
when C.B. was absent during the summer.  Finally, appellant emphasizes her
testimony that she called HHSC frequently to add and remove C.B., creating so
much paperwork that HHSC instructed her to cease claiming C.B.  However, viewing
all the evidence in the light most favorable to the verdict, we conclude that
the jury could have found each challenged element beyond a reasonable doubt.

Senior fraud investigator McCoy reviewed HHSC caseworker notes from appellant’s
application interviews for the duration of the alleged fraud, which, according
to McCoy, began in April 2002.  McCoy testified, “I was able to obtain court
records . . . saying [C.B.] was in Mrs. Nesmith’s custody.  And basically, I
went through the caseworker’s documentation and for each interview it suggested
that [appellant] said [C.B.] was, in fact, in her household, and I got more
information suggesting that she was not.”  McCoy testified appellant told her that
C.B. was staying with Nesmith in order to attend school, but that appellant had
possession of C.B. during weekends.[7]  Although
McCoy did not investigate whether C.B. lived with appellant on any single day,
she was able to determine if C.B was part of appellant’s household “on a certain
month or any certain month,” and explained that there was an overissuance for
the months C.B. was not part of appellant’s household (McCoy did not disclose
these specifics at trial).

McCoy testified appellant was overissued $4,093.43 in benefits after
claiming C.B. as a member of her household.  She calculated this amount using a
computerized budget system that reflected the amount of benefits appellant
received each month.  McCoy input that C.B. was not part of appellant’s
household, and the system output the amount for which appellant was eligible absent
C.B.  She also calculated the amount appellant was overissued by claiming C.B. 
McCoy did not provide a monthly computation reflecting the incremental
overpayments, and no document was admitted reflecting her method of computation.

The parties agree McCoy did not specify when the overissuance ended. 
Nevertheless, eligibility specialist Brock testified that she interviewed
Nesmith in July 2004 and determined appellant was claiming C.B.  Brock notified
appellant she would no longer be allowed to claim benefits for C.B.  According
to Brock, C.B. was removed from appellant’s benefits calculation when appellant
failed to respond to the notification.  Brock explained it was too late to recalculate
appellant’s benefits for August, but that C.B. could be included in Nesmith’s
benefits in September.[8]  This testimony
supported an inference that appellant stopped receiving funds for C.B. by September
2004, and also that McCoy’s investigation ended in September 2004. 
Accordingly, there was evidence appellant was overissued $4,093.43 by claiming
C.B. from on or around April 1, 2002 until on or around August 1, 2004.[9] 


Our next inquiry is whether the evidence supported the jury’s finding that
appellant misappropriated these funds by deception and with the requisite
criminal intent.  The HHSC witnesses testified that whomever a child resides
with most of the time may, or is likely eligible to, claim benefits for the
child.  However, there is no evidence HHSC personnel relayed to appellant, or
that appellant was aware of, this standard.  The only evidence relevant to
appellant’s understanding of whether she could claim benefits for C.B. was
provided by appellant.  Appellant admitted she understood HHSC eligibility
requirements when she claimed benefits for her children.  She testified HHSC
personnel told her she could claim benefits for C.B. during months when the
child stayed with her at least fifteen days.[10] 
Thus, to establish appellant received benefits by creating or confirming a
false impression that she did not believe to be true, there must be legally-sufficient
evidence to support the contention that she claimed and received benefits for
C.B. during months she did not have C.B. at least fifteen days.

Several witnesses testified that C.B. lived with appellant, but no one expressly
stated how many days per month C.B. was with appellant.  It was undisputed that
C.B. spent time with both Nesmith and appellant.  Nesmith testified that she
has fed, clothed, and provided spending money to C.B. since she was one-year
old.  Nesmith testified that in 2002, when C.B. was nine-years-old, she took C.B.
to school, and C.B. lived with her and slept at her house.  She further
testified that C.B. stayed with her in 2004.  Nesmith also testified that C.B. may
have spent four days in a row at appellant’s house.

Nesmith’s daughter-in-law, Sondra Inglehart, testified that, in 2002 when
C.B. was nine-years old, she spent her time mostly at Nesmith’s house. 
Inglehart explained, “I am not saying [C.B.] doesn’t go to her mom’s two or
three days at a time but she lives with [Nesmith] as far as I am concerned. . .
.  [H]er clothes, her computer, her everything is at her house; and [Nesmith]
takes care of her.”  When asked if C.B. lived between homes when she was ten-years-old,
Inglehart responded “In my opinion she visited her mom.  That’s how I am
looking.  I see her at [Nesmith’s] house all the time.”

Robin Nieman lived and worked at the apartment complex where Nesmith
resided and has known C.B. since 2001.  She saw C.B. at Nesmith’s apartment
“all the time,” testified C.B. spent the night with Nesmith “most of the time,”
and elaborated, “[E]very time that I would go pick [C.B.] up or go see her, she
would be at [Nesmith’s], which would be, I would say, once a day, you know,
because I would always hang out with her.”  Nieman also testified that she saw
appellant come and retrieve C.B. periodically, for instance, some months twice
a week and some months not at all.

Finally, as noted above, McCoy testified appellant explained she
retrieved C.B. on Fridays for the weekend because C.B. was only with Nesmith to
go to school.  This evidence supports an inference that appellant did not have
C.B. at least fifteen days per month during the school year.[11]

We conclude the foregoing, although certainly not a model of
clarity on the issue, when viewed in the light most favorable to the verdict, supports
a logical inference that C.B. did not spend at least fifteen days per month
with appellant during the relevant time period.  See Hooper, 214
S.W.3d at 16; see also Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (“Each
fact need not point directly and independently to the guilt of the appellant,
as long as the cumulative effect of
all the incriminating facts are sufficient to support the conviction.”).[12] 
Appellant’s claiming and
receiving benefits for C.B., despite not possessing her for the requisite
amount of time, supported the jury’s finding that appellant unlawfully
appropriated the benefits by deceiving HHSC.  See Tex. Penal Code Ann. §§
31.01(1)(A), (3)(A); 31.03(b)(1).  This evidence also supported the State’s
contention that appellant intended to deprive HHSC of the benefits. 
Accordingly, we conclude the evidence is legally sufficient to support beyond a
reasonable doubt that appellant unlawfully appropriated $4,093.43 from HHSC
from on or about April 1, 2002 to on or about August 1, 2004, with intent to
deprive HHSC of said amount.[13]  We overrule
appellant’s first, third, and fourth issues.[14]

B.        Due
Process

We next consider issues two and five, in which appellant contends her due
process rights were violated.

In her second issue, appellant contends her conviction constitutes a
deprivation of due process that amounts to an ex post facto violation.  She
argues that she was convicted on less or different evidence than required by
law at the time of the offense because witnesses expressed standards of “living
together” not in conformity with federal food-stamp law and regulations and the
prosecutor emphasized these erroneous standards.  Specifically, appellant
asserts that the HHSC employees testified that a person is entitled to benefits
for a child when the person has legal custody of the child and they live
together “more than half the time.”[15]  According
to appellant, “living together” should have been defined in the charge as a
determination made by “application of a reasonable judgment based on the
circumstances of a particular living arrangement.”  47 Fed. Reg. 52,328,
52,329.

“The prohibition against ex post
facto laws is a prohibition against legislative and not judicial action.”  Ex
parte Bonham, 707 S.W.2d 107, 108 n.1 (Tex. Crim. App. 1986). 
However, “a judicial decision having an unjust retroactive application is
barred by the due process provisions of the Fifth and Fourteenth Amendments to
the United States Constitution rather than Article I, Section 10’s ex post
facto provision.”  Id.  An unforeseeable judicial construction of a
criminal statute, applied retroactively, can function like an ex post facto
law and violate the Due Process Clause.  See Bouie v. City of Columbia,
378 U.S. 347, 353, 84 S. Ct. 1697, 1702 (1964).  “If a judicial construction of
a criminal statute is unexpected and indefensible by reference to the law which
had been expressed prior to the conduct in issue, it must not be given
retroactive effect.”  Id. 378 U.S. at 354, 84 S. Ct. at 1703 (quotation
omitted).  A state judicial decision may not operate retroactively if it has
the effect of depriving persons of fair notice of what conduct will give rise
to which criminal penalties.  Proctor v. State, 967 S.W.2d 840, 845
(Tex. Crim. App. 1998).

It has long been held that unlawfully obtaining welfare assistance “is
properly chargeable under the [general theft statute.]”  See Ex parte
Mangrum, 564 S.W.2d 751, 756 (Tex. Crim. App. 1978).  More specifically,
unlawfully obtaining food stamps is chargeable under the general theft
statute.  See Gomez, 663 S.W.2d at 663–64.  Nothing that occurred in
this case altered the requirement that each element of theft be found beyond a
reasonable doubt.  As explained above, HHSC’s standards for determining
food-stamp eligibility were relevant only as evidence of whether appellant used
deception to unlawfully appropriate food stamps without HHSC’s effective
consent.  Appellant contends an ex post facto­-type due process
violation occurred because the standards testified to at trial did not comport
with the federal rule.

We have found no caselaw supporting appellant’s contention that the trial
court’s failure to include sua sponte the definition of a federal
standard promulgated to instruct state agencies in making welfare-eligibility
determinations resulted in an ex post facto-type due process violation
depriving appellant of fair warning of what conduct could subject her to
criminal penalty.  Appellant
does not complain of any judicial construction of law that subjected her to conviction
for conduct without fair warning.  We agree with the State that “[a]ppellant may dispute whether
the [HHSC] interpretation of the law was accurate, but that is not an ex
post facto issue.”[16] 
Accordingly, we overrule appellant’s second issue.

In her fifth issue, appellant contends her conviction violated due
process because she was never apprised that she may not be eligible to claim
C.B.  Due process requires the government to enact and administer laws and
regulations in a manner giving citizens fair warning of what is illegal.  See
Cox. v. Louisiana, 379 U.S. 559, 574, 85 S. Ct. 476, 486 (1965).  Appellant
argues the laws and regulations that control who “lives together” for purposes
of food-stamp eligibility is so vague even HHSC could not apply it, and she was
left unaware of possible violations.  Appellant appears to argue that federal
law and HHSC’s standards for determining what constitutes a “household”
eligible to receive food stamps is unconstitutional both on its face and as applied
to her.  Appellant has waived this issue by failing to challenge the
constitutionality of food stamp law and regulations in the trial court.[17]
 Nevertheless, appellant’s contention is without merit.

It is a basic principle of due process that a statute is void for
vagueness if its prohibitions are not clearly defined.  State v. Holcombe,
187 S.W.3d 496, 499 (Tex. Crim. App. 2006).  A statute is invalid if it fails
to give a person of ordinary intelligence a reasonable opportunity to know what
conduct is prohibited.  Id.  A plaintiff who engages in conduct clearly
proscribed cannot complain of the vagueness of the law as applied to the
conduct of others.  Bynum v. State, 767 S.W.2d 769, 774 (Tex. Crim.
App. 1989) (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates,
Inc., 455 U.S. 489, 495, 102 S. Ct. 1186, 1191 (1982)).  When challenging
the constitutionality of a statute, it is incumbent upon a defendant to show
that, in its operation, the statute is unconstitutional to her in her situation. 
Id.  

As mentioned supra, the Department of Agriculture has deferred to state
agencies to determine whether two or more persons live together as a
“household.”  Appellant admitted she was aware of HHSC’s eligibility standards
when she claimed benefits for her children.  She testified that she informed
HHSC about her living arrangement with C.B., and they instructed her she could
claim a child who resides with her at least fifteen days per month.  We have
already held that this evidence supported the contention that HHSC complied
with the federal rule that a state agency determine whether individuals live
together based on the particulars of their living arrangement.  It also
supported the State’s contention that appellant understood the requisites for
claiming benefits.  Accordingly, the pertinent food stamp regulations are not
unconstitutionally vague as applied to appellant’s situation or on their face. 
See Santikos v. State, 836 S.W.2d 631, 633 (Tex. Crim. App. 1992). 
Accordingly, we overrule appellant’s fifth issue.

C.        Instruction
on Mistake of Law

            In
her sixth issue, appellant contends the trial court erred by denying her
request for a mistake-of-law instruction in the jury charge.  Appellant contends
the evidence presented at trial raised an issue on mistake of law under
subsection 8.03(b)(1) of the Texas Penal Code, entitling her to an instruction
on the affirmative defense.

In reviewing a claim of jury-charge
error, we first determine whether there was charge error.  See Almanza v. State, 686 S.W.2d 157,
171 (Tex. Crim. App. 1985), overruled on other grounds,
Rodriguez v. State, 758 S.W.2d 787 (Tex. Crim. App. 1988).  A defendant is entitled to an affirmative-defensive instruction on
every issue raised by the evidence, regardless of the strength of the
evidence.  Brown v. State, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997). 
The defendant’s testimony alone may be sufficient to raise a defensive theory
requiring a charge.  Id.

            Subsection
8.03(b)(1) states: 

(b) It is an affirmative defense to prosecution that
the actor reasonably believed the conduct charged did not constitute a crime
and that he acted in reasonable reliance upon:

 

(1) an official statement of the law contained in a
written order or grant of permission by an administrative agency charged by law
with responsibility for interpreting the law in question[.]

Tex. Penal
Code Ann. § 8.03(b)(1) (Vernon 2003).  

            At
the charge conference, appellant requested an instruction on mistake of law
based on a grant of permission by HHSC.  Appellant testified that she received
oral instruction from HHSC personnel on when and whether to claim C.B.  Thus,
the operative question is whether subsection 8.03(b)(1) requires a written
grant of permission.  We have found no cases specifically interpreting “grant
of permission.”  However, the Court of Criminal Appeals and several
intermediate appellate courts, including this court, have emphasized that an
official statement must be in writing to constitute the basis of a mistake-of-law
defense.  See Austin v. State, 541 S.W.2d 162, 166 (Tex. Crim. App.
1976); Kuhns v. State, No. 03-01-00063-CR, 2002 WL 463223, at *11
(Tex. App.—Austin March 28, 2002, pet. ref’d) (not designated for publication);
Boyd v. State, No. 14-94-00796-CR, 1996 WL 153979, at *1 (Tex.
App.—Houston [14th Dist.] April 4, 1996, no pet.) (not designated for
publication); Linder v. State, 734 S.W.2d 168, 171 (Tex.
App.—Waco 1987 pet. ref’d).  We conclude that an official statement of the law
in a grant of permission must be in writing for a defendant to assert mistake
of law based on that statement.[18]  Here, there
was no evidence appellant received any official written statement pertaining to
eligibility for benefits.  Thus, the trial court did not err in denying appellant’s
request for an instruction on mistake of law.  We overrule appellant’s sixth
issue.

D.        Jury
Argument

In her seventh and final issue, appellant contends the trial court erred
in overruling her objection during jury argument when the prosecutor opined on
the credibility of C.B.:

[PROSECUTOR:] My argument is this: I am not going to
put a witness on the stand that I don’t personally believe.  Okay.  You watched
her testify and he calls her the most credible witness.  I guess opinion is
different because I find her the most incredible -- well, next to the defendant
-- second most incredible witness on the stand.  What is she going to do,
ladies and gentlemen?  I feel sorry for the poor girl.  She has got a
grandmother, and she has got her mother sitting in the courtroom. She is being asked
basically to prosecute her mom.  She catches what’s going on.

She may not understand the potential range of
punishment and the whole aspect of the division of what’s a misdemeanor and
what’s a felony and what’s what, but she knows something serious that 12 of you
are sitting in this box okay.  She knows something is very serious.  I am not
going to put a witness that I don’t personally believe.  I will not cross.

[DEFENSE COUNSEL:] Judge, I think he’s going beyond
the record on this.

[PROSECUTOR:] He called.

[DEFENSE COUNSEL:] But he’s saying what he didn’t
believe.

THE COURT: Overruled.

We conclude no error occurred because appellant’s counsel invited the
prosecutor’s argument on C.B.’s credibility.  See Longoria v. State, 154 S.W.3d 747, 766 (Tex. App.—Houston [14th Dist.] 2004, pet.
denied) (“Under the
invited argument rule, a prosecutor is entitled to respond to defensive
argument that goes outside the record, so long as the prosecutor’s argument
does not stray beyond the scope of the invitation.”).  Specifically, during closing
argument, appellant’s counsel expressed that the State did not call C.B. as a
witness or even talk to her until the morning of her testimony (argument supported
by the record), but then later commented on C.B.’s veracity by arguing, “We
can’t get any better than [C.B.]  She is the one.  She told it like it is.  We
could have brought witnesses to say the same thing but why?  You don’t believe
her, you are not going to believe anybody else.”  Accordingly, we overrule appellant’s
seventh issue. 

We affirm the trial court’s judgment.

                                                            

                                                                        /s/        Charles
W. Seymore

                                                                                    Justice

 

Panel consists of Chief Justice Hedges and Justices Seymore
and Sullivan.

Do Not Publish — Tex. R. App. P. 47.2(b).









[1] The 1999
version of, and 2002 amendment to, subsection 2012(i) are substantially the
same as the current version section 2012(n).  See 7 U.S.C.A. § 2012(n)
(West Supp. 2009).





[2] The
language used to define “household” in 7 C.F.R. 273.1, subsections (a) and
(b)(1)(ii), is the same now as it was during the period appellant allegedly
committed theft.  See 65 Fed. Reg. 64586 (Oct. 30, 2000) (amending
subsections (a) and (b) of section 273.1).

At the time appellant’s
fraud allegedly began, the income assistance services program was in Texas
Department of Human Services (“DHS”); “DHS include[d] or exclude[d] people from
the food stamp household as specified in the Food Stamp Act of 1977 . . . .”  See
24 Tex. Reg. 6515 (1999), adopting amendment proposed at 24 Tex. Reg. 4973
(2004) (former 40 Tex. Admin. Code § 3.501(c)).  In 2004, subsection 3.501(c)
was repealed and section 3.151 was substituted.  See 29 Tex. Reg. 2664
(2004) & 29 Tex. Reg. 2673 (2004), adopting proposed section and repeal at
28 Tex. Reg. 9748 (2003) & 29 Tex. Reg. 9772 (2003) (former 40 Tex. Admin.
Code § 3.151).  The language in section 3.151 expressed that benefits were
provided by household “as defined in 7 C.F.R. § 273.1.”  See 28 Tex.
Reg. 9748 (adopting language still used at 1 Tex. Admin. Code § 372.151).  That
same year, section 3.151 was transposed to Title 1 of the Texas Administrative
Code, section 372.151.  See 29 Tex. Reg. 6361 (2004) (current version at
1 Tex. Admin. Code § 372.151 (2009) (Tex. Health & Human Servs. Comm’n,
Receiving SNAP Benefits).  This transposition made HHSC responsible for income
assistance services.





[3] The “food
stamp program” is now referred to as the “supplemental nutrition assistance
program.”  See 7 U.S.C.A. § 2012(l) (West Supp. 2009).





[4] Subsection
(a) of 7 C.F.R. 273.3 is the same now as it was during the period appellant
allegedly committed theft.  See 61 Fed. Reg. 54317 (Oct. 17, 1996)
(amending subsection (a) of section 273.3).





[5] Appellant
cites Robinson v. Block as support that HHSC’s standards violated
federal law.  869 F.2d. 202 (3d Cir. 1989).  The court in Robinson held a
state department determination that siblings lived together whenever they had
the same address was inconsistent with the federal mandate to consider all
circumstances.  Id. at 212–14.  Appellant’s reliance on Robinson is
unpersuasive because HHSC personnel considered the particular circumstances of
her situation.





[6] McCoy
testified that these were the only applications she could locate.  





[7] Appellant
testified that she told McCoy she had possession of C.B. full time, not just on
weekends.  However, we resolve inconsistencies in favor of the verdict.  See
Curry, 30 S.W.3d at 406.





[8] Nesmith never received HHSC benefits for C.B. because
Nesmith found employment, vitiating her need for assistance. 





[9] Because it is alleged in the indictment the theft
occurred from on or around April 1, 2002 to on or around August
1, 2004, it is irrelevant that McCoy’s investigation may have included money
overissued after August 1, 2004.  It is well established the “on or about”
language “allows the State to prove a date other than the one alleged in the
indictment as long as the date is anterior to the presentment of the indictment
and within the statutory limitation period.”  Sledge v. State, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997). 






[10] Although appellant also testified HHSC personnel
later told her she could claim benefits for C.B. when she lived with her at
least fourteen days, the jury was free to disregard such testimony, and we
review all evidence in the light most favorable to the verdict.  See
Hernandez, 161 S.W.3d at 491; Young, 14 S.W.3d at 753.





[11] The prosecutor emphasized this testimony during jury
argument: “[Appellant] said, I have the child on the weekends.  At the most
there [are] five weekends a month.  So, that’s ten days a month.  That doesn’t
follow the defense theory if you have it at least half of the time then you
have possession of that child.”  





[12] We
acknowledge that, according to appellant’s testimony, she need only have the
child half the time on thirty-day months (fifteen days out of thirty days) and
less than half the time on thirty-one day months (fifteen days out of
thirty-one days) to be entitled to receive benefits for the child.  Based on
the evidence, we conclude a rational jury could have logically inferred C.B.
was with Nesmith most of the time each month during the relevant time
frame.  From this inference, it was reasonable and logical to infer that C.B.
was with Nesmith more than sixteen days per month, which, in turn, means
appellant did not have the child the necessary fifteen days per month, e.g.,
if X lives with Y most of the time, it is logical to infer X lives with Y more
than sixteen days during a thirty-one day month.





[13] Despite determining that the evidence is legally
sufficient, we wish to exemplify the difficulty of such a determination under
the particulars of this case.  First, without appellant’s testimony that HHSC
informed her she could claim benefits for a child who lived with her at least
fifteen days, there is no evidence relative to appellant’s understanding as to
what HHSC required.  Nowhere in the governmental-assistance applications is
there any explanation concerning who qualifies as a member of an applicant’s
household.  Further, none of the HHSC witnesses testified that HHSC personnel
explained to appellant who she can and cannot claim as part of her household
for eligibility purposes.  In this case, appellant’s admission that HHSC told
her she could claim benefits for those living with her at least fifteen days
per month is the sole evidence that she understood her eligibility to claim
benefits on behalf of C.B.  Because of appellant’s testimony, the evidence is
legally sufficient to support the jury’s findings on deception and intent.





[14] Appellant
further argues her situation is analogous to contract disputes prosecuted under
criminal law because there is a dispute regarding whether she believed she was
entitled to the benefits.  Appellant cites cases holding a conviction for theft
is unsupported by mere evidence that a defendant accepted money pursuant to a
civil contract but failed to perform fully under the contract, i.e., a
bona fide dispute exists regarding ownership of the money.  See Jacobs v.
State, 230 S.W.3d 225, 231–32 (Tex. App.—Houston [14th Dist.] 2006, no
pet.); Bokor v. State, 114 S.W.3d 558, 560–61 (Tex. App.—Fort Worth
2002, no pet.); Stockman v. State, 826 S.W.2d 627, 636 (Tex. App.—Dallas
1992, pet. ref’d).  These cases are not analogous because there is evidence
appellant understood the eligibility requirements but nonetheless claimed
benefits for an ineligible child.





[15] No HHSC witness testified that a person must
have legal custody of a child to be eligible to claim benefits for that child.





[16]
Furthermore, the requirement that a welfare
beneficiary must actually reside in a claimant’s home more than half the time
under scrutiny does not necessarily contravene the federal rule that “lives
with” be determined by application of a reasonable judgment based on the
circumstances of a particular living arrangement.  Certainly, the most
important circumstance to consider when determining if two people “live with”
each other is the amount of time they actually cohabit. 





[17] See
Karenev v. State, 281 S.W.3d
428, 434 (Tex. Crim. App. 2009) (holding defendant may not assert “a
facial challenge to the constitutionality of a statute” for the first time on
appeal); Dockstader v. State, 233 S.W.3d 98, 102 (Tex. App.—Houston
[14th Dist.] 2007, pet. ref’d) (explaining defendant must preserve an as-applied
challenge to constitutionality of a statute).

 





[18] Relying on rules of grammar and common usage, we
conclude “written order or grant of permission” means “written order” and
“written grant of permission.”  See Tex. Gov’t Code Ann. § 311.011(a)
(Vernon 2005); see also Osterberg
v. Peca, 12 S.W.3d 31, 37­­–39 (Tex.
2000); State v. Huggins, 802 So.2d
276, 278 (Fla. 2001) (phrases where an adjective is followed by a list of
nouns “are commonly construed to mean that the adjective modifies subsequent
nouns, for example, ‘qualified man or woman’ and ‘governmental fine or penalty’
mean ‘qualified man or qualified woman’ and ‘governmental fine or governmental
penalty,’ respectively.”).